MENDENHALL ET AL. *v.* CITY OF AKRON ET AL.

SIPE ET AL. *v.* NESTOR TRAFFIC SYSTEMS, INC. ET AL.

**[Cite as *Mendenhall v. Akron,* 117 Ohio St.3d 33, 2008-Ohio-270.]**

(No. 2006–2265—Submitted September 18, 2007—Decided January 31, 2008.)

LANZINGER, J.

{¶ 1} In this case, we decide whether a municipality may constitutionally use its home-rule powers to authorize a method of traffic enforcement that imposes a civil fine on the registered owner of a vehicle identified by automatic camera to be speeding in a school zone.

{¶ 2} We have accepted pursuant to S.Ct.Prac.R. XVIII(6) an issue certified by the United States District Court for the Northern District of Ohio, Eastern Division: "Whether a municipality has the power under home rule to enact civil penalties for the offense of violating a traffic signal light or for the offense of speeding, both of which are criminal offenses under the Ohio Revised Code." Although, as certified by the federal court, the issue embraces both speed-limit and red-light enforcement, the record here deals with a single city ordinance involving enforcement of speed limits. We will therefore confine our analysis to comparing the ordinance with the state statute dealing with speed regulations, acknowledging, however, that the same analysis will dispose of questions concerning red-light cameras.

{¶ 3} The federal litigation giving rise to the certified question involved a challenge to an Akron ordinance.

## I.   The Akron Ordinance

{¶ 4} The facts as presented by the federal court have been stipulated by all parties. Prompted by the death of a child caused by a hit-and-run accident in a school crosswalk, in September 2005, the Akron City Council passed Ordinance 461–2005, providing for an "automated mobile speed enforcement system." This ordinance was codified in Chapter 79.0 and Section 79.01 of the city code and authorizes the use of cameras in mobile units to identify speed-limit violators in school zones.

{¶ 5} In adopting the ordinance, the city council stated that "an automated mobile speed enforcement system will assist the Akron Police Department by alleviating the need for conducting extensive conventional traffic enforcement in and around school zones." To implement the ordinance, the city of Akron entered into a contract with Nestor Traffic Systems, Inc. ("Nestor") to install and administer the automated enforcement system.

{¶ 6} The ordinance creates a system that Akron maintains is purely civil in nature. The system provides for the automated enforcement of existing traffic laws and does not modify any speed limits set by the state. The ordinance authorizes the imposition of civil monetary fines when the posted speed limit in the targeted enforcement areas has been violated. If a vehicle exceeds the posted speed limits, the owner of the vehicle receives a "notice of liability," which includes photographs of the vehicle, the vehicle's license plate, the date, time, and location of the violation, the posted speed limit, the vehicle's speed at the time of

the violation, and the amount owed as a civil penalty. The criminal justice system is not involved in penalizing violations of the speed limit captured by an automated camera. Unlike those who receive speeding citations from a police officer who has observed the infraction, speeders caught by the automated enforcement system do not receive criminal citations, are not required to appear in traffic court, and do not have points assessed against their driving records.

{¶ 7} Owners of vehicles receiving notices of civil liability have several options. They may pay the amount owed, sign an affidavit that the vehicle was stolen or leased to someone else, or administratively appeal the violation. Owners choosing to appeal have 21 days to complete and return the notice-of-appeal section of the notice-of-liability form.

{¶ 8} Administrative appeals of notices of liability are overseen by a hearing officer, who is an independent third party appointed by the mayor of Akron. After administering the oath to any witnesses and reviewing all the evidence, the hearing officer determines whether a violation of Section 79.01 of the Codified Ordinances of the city of Akron is established by a preponderance of the evidence and whether the owner of the vehicle is liable for that violation. The images of the vehicles and their license plates, the ownership records of the vehicles, and the speed of the vehicles on the date in question are considered prima facie proof of a civil violation and are made available to the appealing party.

## II.   Complaints Filed

{¶ 9} In December 2005, a few months after the automated enforcement system was instituted, two lawsuits challenging the ordinance were filed against the city and against Nestor, asserting claims that the ordinance exceeded Akron's home rule authority and also violated due process.

{¶ 10} One such suit was filed by Kelly Mendenhall. In November 2005, Mendenhall received an automated citation, noting her vehicle's speed of 39 m.p.h. in a 25 m.p.h. zone. Mendenhall exercised her right to an administrative appeal, which was sustained. The citation was dismissed, and no civil penalty was assessed against her because on the day of her citation, the 25 m.p.h. speed limit sign was either missing or had been vandalized.

{¶ 11} Despite dismissal of her citation, Mendenhall filed a complaint and class-action lawsuit for declaratory judgment, injunctive relief, and monetary judgment against the city of Akron, the city council members in their official capacity, and Nestor. The city of Akron and Nestor removed the case to the United States District Court for the Northern District of Ohio, Eastern Division.

{¶ 12} The second lawsuit was instituted by three individuals. Janice A. Sipe and Joanne L. Lattur both received single civil citations for speeding, did not appeal, and have not paid the fine. Wayne Burger received two civil speeding

citations, 20 minutes apart, in the same school zone. The city dismissed the second violation, as it did for others who received two citations in the same day during the beginning of the program. Burger's administrative appeal was denied because he had failed to appear at the hearing. He also has not paid his fine. Sipe, Lattur, and Burger filed a complaint similar to Mendenhall's. The city and Nestor also removed their case to the United States District Court for the Northern District of Ohio, Eastern Division.

{¶ 13} In both cases, the federal district court initially ruled that the city of Akron had the power under home rule to create the automated speed-enforcement system because the ordinance creating the system "neither permits or [sic] licenses that which the laws of the Ohio General Assembly either forbid or prohibit and vice versa." See *Mendenhall v. Akron* (May 17, 2006), N.D.Ohio Nos. 5:06 CV 0139 and 5:06 CV 0154, 2006 WL 1371641. The district court also held that "Akron City Ordinance 461–2005 is a proper exercise of the powers bestowed on the City of Akron by Article XVIII, Section 3 of the Ohio Constitution." Id.

{¶ 14} Following that decision, however, the Court of Common Pleas of Trumbull County held, in *Moadus v. Girard* (July 6, 2006), Trumbull C.P. No. 05–CV–1927, 2006 WL 4092324, that a municipality's speed-enforcement system using a camera and radar device violated the Home Rule Amendment of the Ohio Constitution. In reaching its decision, the court of common pleas rejected the federal district court's reasoning and determined that the Girard system "transform[ed] what the State has defined as criminal conduct into merely a civil wrong."

{¶ 15} As a result of *Moadus*, the district court reconsidered its earlier decision in the two cases. The court vacated the order finding that Akron's automated speed-enforcement system did not violate the Ohio Constitution and certified the question to this court, asking whether a municipality has the power under home rule to authorize automated speed-enforcement systems of this type.

### III. Legal Analysis

{¶ 16} Section 3, Article XVIII of the Ohio Constitution provides that municipalities are authorized "to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

{¶ 17} We use a three-part test to evaluate claims that a municipality has exceeded its powers under the Home Rule Amendment. "A state statute takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the police power, rather than of local self-government, and (3) the statute is a general law." *Canton v. State*, 95 Ohio

St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 9. Although it may seem that the three issues should be taken in sequence as stated, we must examine the two legislative enactments before determining whether a conflict exists. Thus, the *Canton* test should be reordered to question whether (1) the ordinance is an exercise of the police power, rather than of local self-government, (2) the statute is a general law, and (3) the ordinance is in conflict with the statute.

{¶ 18} The first part of the test relates to the ordinance. As we have held, "If an allegedly conflicting city ordinance relates solely to self-government, the analysis stops, because the Constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction." *Am. Fin. Servs. Assn. v. Cleveland,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, ¶ 23. If, on the other hand, the ordinance pertains to "local police, sanitary and other similar regulations," Section 3, Article XVIII, Ohio Constitution, the municipality has exceeded its home rule authority only if the ordinance is in conflict with a general state law. If that ordinance does not relate to local self-government, the second part of the test examines the state statute to determine whether it is a general law. If the statute is not a general law, the ordinance will not be invalidated. Only when the municipality has not exercised a power of self-government and when a general state law exists do we finally consider the third part of the test, whether the ordinance is in conflict with the general law.

## A. The Ordinance

{¶ 19} It is well established that regulation of traffic is an exercise of police power that relates to public health and safety, as well as to the general welfare of the public. See *Linndale v. State* (1999), 85 Ohio St.3d 52, 54, 706 N.E.2d 1227, citing *Geauga Cty. Bd. of Commrs. v. Munn Rd. Sand & Gravel* (1993), 67 Ohio St.3d 579, 583, 621 N.E.2d 696. Here, there is no dispute that the Akron ordinance is an exercise of concurrent police power rather than self-government. Thus, the question remains whether the state statute involved is a general law and, if so, whether the Akron ordinance impermissibly conflicts with the general law.

## B. The Statute as a General Law

{¶ 20} To qualify as a general law, a statute must "(1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." *Canton,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus.

{¶ 21} We must, therefore, determine whether Ohio's speed-limit statute possesses the characteristics of a general law. The parties agree that R.C. 4511.21 governs speed limits in Ohio. A review of this statute shows that it is comprehensive. A general prohibition appears at the beginning: "(A) No person shall operate a motor vehicle* * * at a speed greater or less than is reasonable or proper * * *." The remainder of the statute elaborates on that general prohibition and includes specific regulations. Prima facie speed limits for specified locations are set forth in subdivisions (1) through (13) of division (B). Division (C) provides for no more than a single conviction for a speed violation for the same conduct, although it allows violations to be charged alternatively in a single affidavit. Subdivisions (1) through (6) of division (D) establish specific speed limits for the type of street, highway, or freeway involved. Traffic affidavits are covered in divisions (E) and (F), and division (G) mandates assessment of points for violations.

{¶ 22} The duties of the director of transportation are specified in several divisions. The director is required to maintain appropriate speed limits, pursuant to R.C. 4511.21(H). Speed limits may also be set in conjunction with the local authorities, who may request specific speed limits to be approved by the director, division (I); or local authorities may themselves alter the limits, subject to the director's approval, division (J). Township boards of trustees are given authority over unimproved highways within the township by division (K). The director has authority to raise the limit of freeways and rural multilane highways to 65 m.p.h. with the director of public safety and local authorities pursuant to divisions (L) and (M) respectively. Speed limits on highways subject to more than one local authority are governed by division (N). Specific definitions pertinent to the section appear in division (O). Lastly, division (P) sets forth penalties for speed violations.

{¶ 23} As part of R.C. Chapter 4511, which as a whole regulates traffic laws and the operation of motor vehicles in the state of Ohio, R.C. 4511.21 is part of a statewide and comprehensive legislative enactment. No part of the state is exempt from speed enforcement. The statute thus satisfies the first and second elements of the general-law test established in *Canton* by being "part of a statewide and comprehensive legislative enactment" and by "apply[ing] to all parts of the state alike and operat[ing] uniformly throughout the state." *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, syllabus.

{¶ 24} The statute also satisfies the third element of the *Canton* general-law test, for it "set[s] forth police, sanitary, or similar regulations, rather than purport[ing] only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations." Id. As already noted, R.C. 4511.21 has extensive scope and does more than grant or limit state powers. By

establishing the rules regulating the speed of motor vehicles within Ohio, it is an integral part of the state's traffic laws.

{¶ 25} The fourth question of the general-law test is whether the state law "prescribe[s] a rule of conduct upon citizens generally." Id. One need look only to R.C. 4511.21(A), which plainly begins, "*No person* shall operate a motor vehicle * * *." (Emphasis added.) Thus, the statutory prohibitions apply uniformly and without exception. By using the phrase "no person," R.C. 4511.21 extends its application to the citizens of the state generally and does not single out any group or class for different treatment. The statute becomes more specific in regard to the speed limits themselves, but the requirement that "[n]o person shall operate a motor vehicle * * * at a speed greater or less than is reasonable or proper * * *" demonstrates an intention that all the requirements of the section apply uniformly throughout the state.

{¶ 26} Some of the amici argue that not all portions of R.C. 4511.21, including the penalty provisions, are general laws. They cite *Columbus v. Molt* (1973), 36 Ohio St.2d 94, 65 O.O.2d 244, 304 N.E.2d 245, in which we held summarily that a penalty provision of a municipal ordinance was not in conflict with R.C. 4511.06 (uniform application of traffic laws) or R.C. 4511.99(F) (penalty section for reckless operation) because the statutes were not general laws. *Molt*, however, is inapplicable.

{¶ 27} We have since clarified that sections within a chapter will not be considered in isolation when determining whether a general law exists. See *Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 2 OBR 587, 442 N.E.2d 1278. All sections of a chapter must be read in pari materia to determine whether the statute in question is part of a statewide regulation and whether the chapter as a whole prescribes a rule of conduct upon citizens generally. *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, ¶ 38. When interpreted as part of a whole, R.C. 4511.21 applies to all citizens generally as part of a statewide regulation of traffic laws and motor vehicle operation.

## C. Conflict Analysis

{¶ 28} Because the statute regarding speed limits is a general law, we must finally determine whether, when cities pass ordinances creating automated systems of speed-limit enforcement, the municipal ordinances are in conflict with the state statute. Home rule jurisprudence has become confused over the years because different theories have been used to determine when an ordinance is in conflict with a general state law. This confusion is highlighted in the briefs before us, where several different theories are set forth in the attempt to prove either the presence or absence of a conflict.

### 1. Contrary Directives

{¶ 29} We attempted to clarify how to determine whether an ordinance is in conflict with a general state statute most recently in *Am. Fin. Servs. Assn. v. Cleveland,* 112 Ohio St.3d 170, 2006-Ohio-6043, 858 N.E.2d 776, and in *Cincinnati v. Baskin,* 112 Ohio St.3d 279, 2006-Ohio-6422, 859 N.E.2d 514. There, for purposes of conflict analysis, we adopted as controlling the test of " 'whether [an] ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.' " *Am. Fin. Servs. Assn.,* ¶ 40, and *Cincinnati v. Baskin,* ¶ 19, quoting *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, at paragraph two of the syllabus. We also explained, "No real conflict can exist unless the ordinance declares something to be right which the state law declares to be wrong, or vice versa." *Struthers* at 268, 140 N.E. 519. This test then, which may be labeled "contrary directives," is met if the ordinance and statute in question provide contradictory guidance.

{¶ 30} To determine whether a conflict exists in this case, we first examine the actual conduct that both the state statute and the municipal ordinance target: control of vehicle speed. The Akron ordinance does not change the existing state speed limits; in that respect, the ordinance prohibits conduct identical to that prohibited by state law. The difference between the state statute and Akron ordinance regarding prohibited conduct relates to the party ultimately responsible for a speed violation. While the state statute punishes the driver of the vehicle, the Akron ordinance imposes a fine on a vehicle's owner, who may or may not be the driver at the time of the violation. Ultimately, regardless of the actor who performs it, the actual conduct prohibited—exceeding speed limits—is the same. When a municipal ordinance does nothing more than prohibit the same conduct prohibited by state statute, there is no conflict between the two. See *Fremont v. Keating* (1917), 96 Ohio St. 468, 470, 118 N.E. 114. The Akron ordinance therefore does not conflict with the statute in the strict sense that it does not permit that which the statute explicitly forbids or vice versa.

### 2. Conflict by Implication

{¶ 31} Although on occasion a state statute and municipal ordinance will directly contradict each other, and thereby make a conflict analysis simple and direct, that is not always the case. It is in the context of more nuanced cases that the concept of "conflict by implication" has arisen. Rather than an independent test for identifying a conflict, conflict by implication is a subset of the *Struthers* analysis and recognizes that sometimes a municipal ordinance will indirectly prohibit what a state statute permits or vice versa. *Schneiderman v. Sesanstein* (1929), 121 Ohio St. 80, 167 N.E. 158. In *Schneiderman,* we struck down a city ordinance setting a speed limit at 15 m.p.h., a speed below the statewide limit of 25 m.p.h. We concluded that the statewide limit implicitly

meant that a vehicle could be driven at any speed below 25 m.p.h., which included those speeds that the ordinance otherwise prohibited. Because of this implied conflict, we held that the ordinance exceeded the city's home rule power. Id. at 90, 167 N.E. 158.

{¶ 32} When determining whether a conflict by implication exists, we examine whether the General Assembly indicated that the relevant state statute is to control a subject exclusively. See *Baskin*, 112 Ohio St.3d 279, 2006-Ohio-6422, 859 N.E.2d 514, at ¶ 23. In this case, although the General Assembly has enacted a detailed statute governing criminal enforcement of speeding regulations, it has not acted in the realm of civil enforcement. Indeed, R.C. Chapter 4511, which deals broadly with traffic laws, is silent on the matter.

{¶ 33} The parties challenging the ordinance and their amici argue that R.C. 4511.07 provides for exclusive operation of state traffic statutes and limits the ability of municipalities to enact their own regulations. R.C. 4511.07(A) provides, "Sections 4511.01 to 4511.78, 4511.99, and 4513.01 to 4513.37 of the Revised Code do not prevent local authorities from carrying out the following activities with respect to streets and highways under their jurisdiction and within the reasonable exercise of the police power." The statute then proceeds to list ten specific areas of regulation, none of which would encompass automated speed enforcement. However, we have held that although R.C. 4511.07 "could be viewed as very much like a grant of authority to the municipality, the municipality does not need the grant of authority because it already possesses it pursuant to its home rule powers. The power comes from the Ohio Constitution; it does *not* come from R.C. 4511.07." (Emphasis sic.) *Geauga Cty. Bd. of Commrs.*, 67 Ohio St.3d at 584, 621 N.E.2d 696.

{¶ 34} Thus, R.C. 4511.07 does not expressly signal that the state has exclusivity in the area of speed enforcement. Furthermore, because there is no indication that the state has intended to reserve to itself the ability to enforce statewide traffic laws through a civil process, we decline to recognize a conflict by implication.

### 3. Conflict Regarding Decriminalization

{¶ 35} Our analysis does not end simply because we have determined that there is no conflict, either explicit or implied, regarding the directives of the ordinance and statute. Although both prohibit the conduct of excessive speed, we have also recognized that a municipal ordinance is in conflict with state law when there is a significant discrepancy between the punishments imposed for that behavior. We have held, "When a municipal ordinance varies in punishment with the state statute such ordinance is not in conflict with the statute when it only imposes a greater penalty." *Niles v. Howard* (1984), 12 Ohio St.3d 162, 165, 12 OBR 232, 466 N.E.2d 539. However, we have also held that if the municipal

ordinance does more than simply impose a greater penalty—by changing the character of an offense, for example—the ordinance and statute are in conflict. See *Cleveland v. Betts* (1958), 168 Ohio St. 386, 389, 7 O.O.2d 151, 154 N.E.2d 917.

{¶ 36} Those challenging the Akron ordinance argue that the ordinance has changed the character of the traffic offense of speeding and therefore conflicts with state traffic laws. They argue that civil enforcement of violations identified by the automated system decriminalize behavior that is criminal under state law.

{¶ 37} This argument, however, reflects a fundamental misunderstanding of the actual effect of the Akron ordinance. The ordinance does not change the speed limits established by state law or change the ability of police officers to cite offenders for traffic violations. After the enactment of the Akron ordinance, a person who speeds and is observed by a police officer remains subject to the usual traffic laws. Only when no police officer is present and the automated camera captures the speed infraction does the Akron ordinance apply, not to invoke the criminal traffic law, but to impose an administrative penalty on the vehicle's owner. The city ordinance and state law may target identical conduct—speeding—but the city ordinance does not replace traffic law. It merely supplements it. Furthermore, a person cannot be subject to both criminal and civil liability under the ordinance. The ordinance states that if a violation is both recorded by the automated system and observed by a police officer, then the criminal violation takes precedence. The Akron ordinance complements rather than conflicts with state law.

## IV.   Other Theories

{¶ 38} Some of the parties advance a preemption argument, claiming that the state has intended to completely occupy the field of traffic regulation, thereby preempting any action by municipalities. Such a home rule analysis has never been adopted by a majority of this court, and we decline to apply such an analysis today.

{¶ 39} Much has been made of the motivation behind the city's decision to adopt an ordinance of this type. There is disagreement among the parties as to whether the city's decision was motivated by concerns over safety or by a desire to increase revenue. Motivation does not play any role in home rule analysis, however, and a city has the right to enact "such local police, sanitary and other similar regulations, as are not in conflict with general laws." Section 3, Article XVIII of the Ohio Constitution. Our state Constitution grants municipalities this right, provided that the automated enforcement system does not supplant or modify the state traffic laws.

{¶ 40} Although there are due process questions regarding the operation of the Akron Ordinance and those similar to it, those questions are not appropriately before us at this time and will not be discussed here.

## V. Conclusion

{¶ 41} As we observed at the outset, the record before us relates to Akron's ordinance, although the federal court's certification covered both speed and red-light enforcement through automated means. We hold merely that an Ohio municipality does not exceed its home rule authority when it creates an automated system for enforcement of traffic laws that imposes civil liability upon violators, provided that the municipality does not alter statewide traffic regulations.

{¶ 42} Enactment of Akron's ordinance is not an exercise of self-government but of concurrent police power. The statute governing speed limits is a general law because it is a comprehensive statewide enactment, setting forth police regulations that apply uniformly to all citizens throughout Ohio. Akron Ordinance 461–2005, which provides for implementation of an automated mobile speed-enforcement system, does not conflict with state law because it does not alter or supersede state law. The ordinance provides for a complementary system of civil enforcement that, rather than decriminalizing behavior, allows for the administrative citation of vehicle owners under specific circumstances. Akron has acted within its home rule authority granted by the Constitution of Ohio.

{¶ 43} We therefore answer the certified question with a qualified yes. A municipality has the power under home rule to enact civil penalties for the offense of violating a traffic light or for the offense of speeding, both of which are criminal offenses under the Ohio Revised Code, provided that the municipality does not alter statewide traffic regulations.

So ordered.

MOYER, C.J., and LUNDBERG STRATTON, MCFARLAND, KLATT, and CUPP, JJ., concur.

PFEIFER, J., concurs in the answer only.

MATTHEW W. MCFARLAND, J., of the Fourth Appellate District, sitting for O'CONNOR, J.

WILLIAM A. KLATT, J., of the Tenth Appellate District, sitting for O'DONNELL, J.

———

Law Offices of Warner Mendenhall, Inc., Jacquenette S. Corgan, and Warner Mendenhall, for petitioner Kelly Mendenhall.

Antoni Dalayanis, for petitioners Janice Sipe, Joanne Lattur, and Wayne Burger.

Max Rothal, Akron Law Director, and Stephen A. Fallis and Michael J. Defibaugh, Assistant Law Directors, for respondent city of Akron.

Squire, Sanders & Dempsey, L.L.P., Richard Gurbst, Heather Tonsing, and Donald W. Herbe, for respondent Nestor Traffic Systems, Inc.

Sutter, O'Connell & Farchione, Thomas H. Terry III, and David W. Skall, for amici curiae Michael McNamara and State Representative James Raussen.

Dworken & Bernstein Co., L.P.A., Patrick J. Perotti, Jonathan T. Stender, and Nicole T. Fiorelli, for amici curiae Dawn Rogaskie and State Representative James T. Raussen.

James A. Denney, for amicus curiae Dan Moadus.

Fritz Byers and Samuel Z. Kaplan, for amici curiae Ann Lewicki, Raymond G. Tobin, and Robert Nash Jr.

Baker & Hostetler, L.L.P., Gregory V. Mersol, and Kristin Ulrich Somich, for amicus curiae ACS State & Local Solutions, Inc.

Stephen L. Byron and John E. Gotherman, for amicus curiae the Ohio Municipal League.

Patrick J. Bonfield, Dayton Law Director, and John C. Musto, Assistant Law Director, for amicus curiae city of Dayton.

Brickler & Eckler, L.L.P., Quintin F. Lindsmith, Vladimir Belo, and Natalie T. Furniss, for amicus curiae Redflex Traffic Systems, Inc.

Richard C. Pfeiffer Jr., Columbus City Attorney, for amicus curiae city of Columbus.

Robert Triozzi, Cleveland Law Director, Thomas J. Kaiser, Chief Trial Counsel, and Gary S. Singletary, Assistant Law Director, for amicus curiae city of Cleveland.

Vorys, Sater, Seymour & Pease, L.L.P., Carrie M. Dunn, and John W. Solomon, for amicus curiae Traffipax, Inc.

John T. Madigan, Toledo Law Director, and Adam Loukx, General Counsel, for amicus curiae city of Toledo.